IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2015

**STATE OF TENNESSEE v. HEATHER RENEE MCCOLLUM**

**Appeal from the Circuit Court for Marshall County**
**No. 13CR20     F. Lee Russell, Judge**

_____

**No. M2015-00656-CCA-R3-CD – Filed April 1, 2016**

_____

Appellant, Heather Renee McCollum, stands convicted of first degree premeditated murder and arson, for which she received consecutive sentences of life in prison without the possibility of parole and five years, respectively. Challenging her convictions and sentence alignment, she raises the following issues in this appeal: (1) whether the evidence was sufficient to support her convictions; (2) whether her arson conviction should be set aside based upon the "physical facts" rule; and (3) whether the trial court erred in aligning her sentences consecutively. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, SP. J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Larry Samuel Patterson, Jr., Columbia, Tennessee, for the Appellant, Heather Renee McCollum.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert James Carter, District Attorney General; and Weakley Edward Bernard, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the stabbing death of the victim, John Homer Poteete, and the subsequent arson of his residence. For her role in these offenses, appellant was charged with first degree premeditated murder and arson.

At appellant's two-week-long trial, the State's first witness was Stanley Goff. On August 14, 2012, he resided in Lewisburg, Tennessee, with his wife and nineteen-year-old daughter and had lived at his current residence for approximately one year prior to that date, during which time he became acquainted with his neighbor, the victim in this case. Mr. Goff's and the victim's backyards adjoined each other. Mr. Goff's backyard overlooked a main thoroughfare through Lewisburg—Franklin Street—on which the victim resided. Three structures were built on the victim's property—a larger house that was close to the street and two smaller structures behind the house. The victim owned the entire property on which he resided but rented the other two structures to other people. The victim lived in one of the smaller structures, which Mr. Goff characterized as "more like a garage-area" that had been converted into a residence. Mr. Goff estimated that from his "back porch to [the victim's] back porch was 30 yards, 50 yards between."

Mr. Goff recalled that he visited with the victim on a regular basis. Mr. Goff would assist the victim by performing odd jobs for him because the victim was disabled; he had only one leg and wore a prosthesis. When asked if Mr. Goff ever visited the victim unannounced, Mr. Goff explained that the men had a "code" to let Mr. Goff know when the victim did not want to be disturbed. If the victim parked his truck parallel to his residence with the driver's door toward his front door, he had a visitor and did not wish to be disturbed. However, if he pulled the truck in straight, with the headlights facing his residence and Mr. Goff's backyard, Mr. Goff could visit. The victim drove a red Dodge pickup truck. Mr. Goff recalled that generally "around the first of the month," the victim would tend to park in a parallel fashion. On some of those occasions, Mr. Goff could see that the victim had an adult female passenger in the truck with him.

On August 14, 2012, Mr. Goff said that he was working for the Lewisburg Water and Wastewater Department. He was on call that night and received a call around 3:50 or 4:00 a.m. to respond to a broken water heater that was flooding a residence. Mr. Goff quickly dressed and walked outside at which time he smelled smoke. He looked around the area and determined that "pretty thick" smoke was emanating from the eaves around the victim's residence. He did not observe any flames. Mr. Goff ran back inside and instructed his wife to call 9-1-1. He then left to answer the service call. When he returned home from the service call between 4:20 and 4:30 a.m., an ambulance, police, and a fire truck were at the victim's residence.

The State's next witness was Jessica Hodge, who rented the other small residence on the victim's property with her husband and four-year-old daughter. Ms. Hodge stated that each home had its own driveway to its respective residence. She recalled that the victim did not leave his house at night; if he went anywhere, it was during the evening hours. She said that he did not have many visitors.

-2-

Ms. Hodge stated that she last saw the victim alive on August 13, 2012. She returned home late that evening, and she watched television in the living room after her husband and daughter had gone to sleep. She remembered seeing the victim leave in his truck around 10:00 p.m. that night and return about thirty minutes later. She could not see if he had a passenger with him. Ms. Hodge said that when the victim parked his truck, he pointed the front of the truck toward his house. Ms. Hodge recalled that the following morning she was awakened around 4:00 a.m. by flashing lights through her window. She looked and saw a great deal of smoke rising from the victim's residence.

The State next called Stanley Joe Pullen as a witness. He testified that he became acquainted with appellant through his father about three or four years prior to the time in question. He resided with his father for a brief time, and appellant resided in the same apartment complex. Mr. Pullen said that on August 13-14, 2012, he lived in a home with his mother, stepfather, nephew, his nephew's girlfriend (Kelly Tidwell), and their three children. On Monday, August 13, he was sitting in the living room watching television when appellant knocked on the front door and asked to use his telephone. He retrieved a telephone for her to use. She stood on the front stoop and placed a call while he lingered in the doorway watching television. The only part of the conversation he overheard was appellant saying that she "would be walking up the road, would they come and pick . . . her up." Mr. Pullen characterized appellant's demeanor as "drunk or something." He said that her eyes were red and that she "could have been crying." Appellant then walked away in the direction of Franklin Avenue.

Mr. Pullen's sister called the following morning between 7:30 and 8:00 a.m. and informed him of the victim's death. He said that prior to that date, he knew of the victim but did not know his name. Around 9:00 a.m. that morning, he was standing in his living room when he saw appellant walk by. He addressed appellant as she was walking down the road. He said, "'I heard that the old man had, had got burned up in the house,'" and she responded, "'Yes, . . . the fire department and every[ ] police was [sic] up there now.'" Appellant's demeanor appeared "normal" to Mr. Pullen. He confirmed that he had previously seen appellant riding in the victim's truck with him "a time or two."

The State's next witness was Officer Clinton Newbill with the Lewisburg Police Department ("LPD"). Officer Newbill was working the night shift on August 13-14, 2012, and responded to a call involving a possible structure fire on Franklin Avenue. He observed that it was not a "rolling fire," so he and Corporal Steve Sanders planned to kick in the door and enter; however, Officer Shawn Crawford, who had some training as a firefighter, advised them to wait for the fire department. Officer Newbill never entered the residence that night or observed the victim. The only significant observation he made about the scene was that a gasoline can was located on the front porch of the victim's residence. When the fire department arrived, he and other officers secured the scene so

that the firefighters could do their job. Upon learning that it was a possible crime scene, they taped off the area and waited for detectives to arrive.

On cross-examination, Officer Newbill acknowledged that he had come into contact with appellant around 8:00 p.m. on the night of August 13. He responded to appellant's address for a "verbal dispute, like a domestic-type . . . altercation or situation." Appellant's husband, Jason McCollum, and another individual, Gary DeJuan O'Neal, were present as well. Officer Newbill opined that appellant had been "drinking a little bit that night." Officers Crawford and Mike Davis also responded to the call. No one was arrested at that time. Officer Newbill estimated that the walking distance between appellant's residence and the victim's residence was around ten minutes, and the driving distance was around two minutes. The walking distance from appellant's residence to Mr. Pullen's residence was around thirty seconds.

LPD Officer Mike Davis was the State's next witness. Prior to becoming a police officer, he had undergone training as a firefighter. Officer Davis was on duty on the night of August 13-14 and was dispatched to a call involving a possible structure fire. Officer Davis, Corporal Sanders, and Officer Crawford were the first officers on the scene. Officer Crawford advised against opening the front door because he did not want oxygen to feed the fire. Based on his experience, Officer Davis opined that had Corporal Sanders opened the door, the "flashover" would have caused flames to shoot outside of the house and would likely have killed the three of them. They waited for the fire department to arrive. Officer Davis explained they were unaware that the structure on fire was a crime scene until they discovered the burned body inside.

Officer Davis testified that his primary responsibility at the scene was to maintain the crime scene log by recording the names of anyone who entered the perimeter of the crime scene tape, the time they entered, and the time they exited. Officer Davis left the scene around 6:00 a.m. when Officer Clyde Ragsdale relieved him and took over responsibility for the log.

Officer Davis acknowledged that he also responded to appellant's residence on the evening of August 13. Upon arrival, he first encountered Mr. McCollum and Mr. O'Neal in the front yard. They informed him that everything was alright and thanked him for coming. Then, appellant exited the residence in an "agitated" state and began cursing at him and Officer Newbill. At no time did appellant ask to speak with an officer or ask to make a statement to an officer. No one was arrested, but a report was still required to be written to alert the next shift that a situation could be developing.

On cross-examination, Officer Davis confirmed that one of the officers advised appellant that because of the way that she was screaming and cursing outside, she would be arrested for either public intoxication or disorderly conduct if she did not go back

-4-

inside the residence. He admitted that he obtained Mr. McCollum's and Mr. O'Neal's version of what had transpired but explained that he had not received appellant's version of the events because "[s]he didn't want to speak. She was telling us to get the 'F' out of there."

LPD Officer Clyde Ragsdale was the State's next witness. He was working the day shift, 6:00 a.m. to 6:00 p.m., on August 14, 2012. When he arrived at the scene, Officer Ragsdale assumed control of the crime scene log and maintained it until his departure at 11:00 a.m.

The State called Lewisburg Fire Department ("LFD") Assistant Chief Jason Davis as its next witness. He responded to the scene around 4:00 a.m. with firefighters Wayne Blackwell and Toby Adams. When they located the victim's residence, Assistant Chief Davis saw "pretty good smoke rolling out" of it. Smoke was also emanating from under the eaves and the edges of the doors. He noted that the front door was unlocked; he checked it for heat by touching it with the back of his hand. He found it to be "a little warm" but not hot. He opened the door and shouted out for any possible victim inside, but he received no answer. Assistant Chief Davis then went to a second door on the front of the house and tested it for heat, and he found it cold. He opened the door and discovered that the area was used for storage.

Assistant Chief Davis testified that he then returned to the front door of the residence and opened it. He entered the living room of the residence and performed a search of the room on his hands and knees. He found some paint cans, a gallon jug of kerosene, and a square box fan that was still running. He was joined by Firefighter Michael Parks, and together they walked along a hallway leading away from the living room and performed a search of the bedroom. Within a few feet, Assistant Chief Davis found a closet with "smoldering products . . . in the floor"; the objects were still glowing red, but he had no idea what they were. Firefighter Parks located a bed, and when he shined his flashlight, they discovered the victim. Assistant Chief Davis said that the victim's hands and arms were "draw[n] up." They did not observe rising and falling of the victim's chest, indicating that he was already deceased.

Assistant Chief Davis recalled that he and Firefighter Parks exited the structure then re-entered with Firefighter Adams and a water hose. At that time, flames were visible along one wall of the bedroom. After dousing the flames, they exited again. Captain Ray Luna advised him that they needed to start ventilating the structure. Captain Steve Anderson walked to the rear of the residence, located a door, and used a concrete block to forcibly open it and hold the door open. They then utilized a fan to push fresh air through the front of the house, which resulted in smoke exiting the rear of the house. Assistant Chief Davis stated that at some point, someone called the Fire Marshal's Office, and an investigator from the Bomb and Arson section, Russell Robinson, arrived

at the scene. Assistant Chief Davis helped Agent Robinson in any way he requested during his investigation.

On cross-examination, Assistant Chief Davis explained that they never searched the kitchen because they "never made it that far." He stated that he did not assist in the collection of evidence. He recalled leaving the scene around 8:00 a.m. on August 14.

LFD Firefighter Michael Parks was called as the State's next witness. Upon his arrival at the scene, Firefighter Parks Assistant Chief (then Captain) Davis at the door of the residence and prepared to enter. Firefighter Parks testified similarly to Assistant Chief Davis with respect to the search of the victim's bedroom and the discovery of the victim's body. After Firefighter Parks' re-entry into the dwelling to extinguish the flames, he did not go back into the residence. He reported to the rear corner of the residence to secure the back door area.

The State's next witness was LFD Captain Steven Anderson. Captain Anderson was not on duty on August 13-14, but he responded to a call that he received via the department's paging system. Police and fire personnel were already on the scene when he arrived, and the firefighters had begun the ventilation process. His initial assessment was that the smoke inside the residence was not clearing properly. In his experience, he felt that the back door of the residence needed to be open to provide cross-draft within the structure, so he located a cinder block or concrete block and used it to forcibly open the locked door. He then propped open the door with the block. Captain Anderson returned to the front of the structure and subsequently made entry along with Chief Larry Williams, Captain Bill Thomas, and emergency medical service personnel.

Justin Whitsett, the assistant director of the Marshall County Emergency Service ("MCES"), was the State's next witness. One of his many duties involved being the medical examiner's death investigator. The medical director of MCES was Dr. Kenneth Phelps, who also served as the county medical examiner.

Assistant Director Whitsett testified that he was on duty on August 14, 2012, and was dispatched to the scene on Franklin Avenue. When it was safe to do so, he and Chief Williams entered the residence. He proceeded to the back room of the residence where he observed the victim. He said, "Based upon the condition of the body and the condition of the room, in my professional opinion, this gentleman was deceased." He noted that the victim's pants were "not where they should be." They were situated between his hips and knees. There was other clothing in the area that was very burned, in addition to a set of keys and some cash. Assistant Director Whitsett described the various wounds that he observed on the victim at the scene. He also took photographs of the scene.

The State called Special Agent Russell Robinson with the State Fire Marshal's Office Bomb and Arson Section as its next witness. Special Agent Robinson was tendered by the State and accepted by the trial court as an expert in the fields of arson investigation and points of origin of fires. Special Agent Robinson stated that he received a call from Chief Williams around 4:30 a.m. on August 14 to respond to a fire in Marshall County. Special Agent Robinson described the residence as one that had formerly been a "carport-style structure that had been converted and modified into a residence." Chief Williams briefed Special Agent Robinson on the fire and fire suppression efforts that had been utilized. Special Agent Robinson then entered the residence so he could observe the fatality. At some point, he learned that many of the firefighters were familiar with the victim so they knew from an early stage the identity of the victim.

The first thing Special Agent Robinson noticed about the victim was that he had "irregular burns" on his chest. He explained, "[N]ormal fire burns evenly given all things equal. When additional items are added, are present, fuel loads or even protective items, they may leave what we call an irregular pattern." He opined that the pattern was consistent with someone having poured household ammonia on the victim before the fire was lit. He said that ammonia is ninety percent water and that "[a]s liquid evaporates, it . . . draws in from the outside edges toward the middle. So, the liquid in the middle is there longer and it's cooling." The result is that the pool protects the skin underneath it so that it does not receive as deep of a burn as the surrounding area.

Special Agent Robinson created three diagrams during his investigation: a diagram of the interior, a diagram of the location of evidence, and a diagram of the location of the victim's body. He stated that he identified "four unrelated points of origin" of the fire in the victim's residence. He explained that a point of origin indicated a specific point where a fire was ignited. He identified the victim's body as a point of origin of fire. He believed that the bedding material was the first material ignited. He posited that additional debris was placed on top of the victim to provide the fire with more fuel. Pursuant to his examination of this point of origin, Special Agent Robinson obtained samples from the bedding and burned clothing, sealed them in paint cans, and submitted them to the laboratory. He found a cigarette lighter underneath the victim's bed, but his observation of the fire indicated that the fire did not begin at floor level. As they began sifting through the burned bedding, Special Agent Robinson found what appeared to be a knife blade.

Special Agent Robinson also located another point of origin in the bedroom closet. Clothes hangers were still hanging on the rod, and burned debris lined the bottom of the closet. He identified the floor of the closet as the point of origin because there was an "actual fire pattern." As the hanging clothes caught on fire and dropped to the floor, they

caused a "V" pattern at that level. He opined that both sources were an open flame source such as a lighter or match.

Special Agent Robinson observed a point of origin of fire in the kitchen, which was a rag placed on the stove. He also located a blue kerosene or gasoline container in the kitchen. Based on the victim's wounds, Special Agent Robinson also focused on locating a possible weapon that could have inflicted those wounds. In the kitchen he found two knives that "were mechanically damaged." One knife had a broken point, and the other had a damaged handle. He submitted the knives to the laboratory for analysis. Special Agent Robinson explained that an unburned portion of the rag was located over one of the burners of the stove. That indicated to him that the stove burner could be eliminated as an ignition source. He opined that the ignition source was an "open-flame" source, such as a cigarette lighter or a match. He stated, "There [were] no fire damage or fire patterns to indicate that this fire caused any of the other three fires."

The final point of origin was found in the living room on the right arm of the love seat as one would face it. He explained that he identified it as a point of origin because of a "small concentrated" area of burning surrounded by an area of unburned material, indicating that the fire did not progress to the other material. He opined that it was ignited by an "open-flame source" such as a cigarette lighter or a match. He dismissed the possibility that it could have been ignited by a lit cigarette because the tobacco market now produces "fire-safe cigarettes [that] self-extinguish." In addition, through his investigation, Special Agent Robinson learned that the victim did not smoke cigarettes. However, two cigarettes were recovered at the scene.

Special Agent Robinson walked around the outside of the residence and observed on the front porch a blue plastic container that would typically contain gasoline or kerosene. He explained that electricity was provided to the victim's residence by use of an extension cord that was run from the larger primary residence at the front of the property to an electrical panel or "breaker box" in the storage room of the victim's residence. Special Agent Robinson confirmed that he examined the panel boxes to determine if they were malfunctioning and concluded that they were not.

Special Agent Robinson opined that when an investigator observed multiple points of origin of fire, it was a "great indicator" that the fire was intentionally ignited. During the course of his investigation, Special Agent Robinson obtained a cigarette lighter from appellant and learned that she smoked cigarettes. The State asked, "At the conclusion of your investigation as to the arson, what is your expert opinion as to whether or not that fire was intentionally set?" Special Agent Robinson responded:

> When we conducted our investigation and determined our area of origin, we found there were four separate, uncommunicated areas of origin, four

-8-

separate points where the fire was lit. We examined each of those four areas to look for accidental ignition sources, anything that could potentially become a, a source of ignition accidentally. We did not find any accidental sources that would fit those four areas from our scene examination.

With that, combined with our areas of origin, multiple areas of origin that were uncommunicated, the opinion that I gave is that, is all four of those areas are intentionally set.

. . . .

[S]ome individual came in, or individuals came in, and set those four places on fire with an open-flame source, such as a cigarette lighter, a match of that nature.

Special Agent Robinson stated that he also investigated the grills at appellant's home. He found remnants of material inside the grill itself. In the woods behind appellant's home, officers located the handle of a knife and a blade of a knife.

Special Agent Robinson testified that when the investigation began, they did not have a suspect. Eventually, appellant was developed as a suspect, and Special Agent Robinson and other officers took five separate statements from her. The State, through questioning, highlighted that in appellant's August 14 statement, she admitted to having visited the victim's residence previously and that she drew a diagram of it. She also described her knowledge of the victim's personal habits, such as the time he retired to bed. She recalled that the victim typically retired around 9:00 p.m., that he generally secured his front door because he had frequent visitors, and that if people visited after he went to bed, he would decline to get up and answer the door. Special Agent Robinson said that during appellant's first statement, she provided approximately "half a dozen" names of potential suspects, including her husband, Jason McCollum. Appellant told Special Agent Robinson that her husband "'didn't like it that she would get money and . . . supplies from [the victim], another man.'" Appellant also said that she telephoned the victim and addressed an allegation that he had molested her children on June 18.

Special Agent Robinson testified that in appellant's August 16 statement, she complained about the LPD. In an attempt to build rapport with appellant, Special Agent Robinson told her that giving a statement to him would prevent her from being questioned by the LPD. Appellant wrote the statement herself and disavowed any knowledge of the fire or the circumstances of victim's death. She denied either setting the fire or "sending" anyone to set the fire. She claimed to have not seen the victim for one to two months prior to his death and said that at the time of the fire, she was at home with all of her family. She said she did not know who would want to harm the victim.

In appellant's third statement on August 17, she recounted the events of August 13. Special Agent Robinson read from her statement that appellant said she was at her apartment with her husband, husband's friend, and mother-in-law, drinking whiskey, when LPD officers arrived to address the noise level. Afterward, her husband walked his friend home because he was intoxicated, and appellant walked to Mr. Pullen's residence to use his telephone. Appellant telephoned the victim and asked him to come get her and drive her to a store where she could purchase beer. The victim then did as requested and drove appellant to a convenient store where she purchased two quarts of beer. Afterward, the victim drove them to his residence around 10:00 p.m. They sat together on the loveseat, and the victim was "rubbing [her] leg." The victim then grabbed her hand. Appellant said:

> We were talking about the kids. He said that he did not touch [my daughter] and asked if I wanted to go in the bedroom and have sex. At that point in time, I started getting angry because of the situation with my daughter. We went into the bedroom. I got undressed . . . .
>
> As he was getting undressed and taking off his leg, I went into the kitchen and got a steak knife with a jagged edge about six inches long with a plastic black handle out of his sink . . . .
>
> I got the knife because he provoked me because of what he was saying to me and about the situation with my daughter. I walked back to the bedroom with the knife and held it behind my back in my right hand. The lights were off in the bedroom except for a night light that was on. [The victim] was lying on the bed wearing only his black . . . boxers. I got on the bed and sat on him[,] straddling his legs. I was completely naked . . . .
>
> I took the knife from behind my back and I starting stabbing him. I stabbed him under his armpit first. He said, ["][T]hat hurts.["] He then tried to sit up. I kept on stabbing him in his stomach and chest area. He then laid [sic] back in the bed. He said, ["]I think I am about to die.["] I saw him then take his last breath.
>
> I sat there for a few minutes and I checked his pulse and didn't feel anything. I got up and grabbed some ammonia from the kitchen counter. It

was in a spray bottle. I took the top off the bottle and poured it out on the bed. I then took my BIC lighter and lit the bed on fire.[1]

After that, I caught the closet clothes on fire with my lighter. I then went into the kitchen and tried to set the kitchen on fire by lighting the wires behind the stove . . . . I set the fire because I didn't want to leave any evidence. I saw his bedroom on fire and the flames spreading, so I got the hell out. I walked out the front door and walked home. It was about 11[:00] p.m. then.

I took the knife that I stabbed [the victim] with and took it outside behind my apartment and put it in a bucket. I then squirted some lighter fluid in the bucket and set it on fire. The fire burned off the plastic part but not the metal part. I took the burned knife and threw it in the bushes behind my apartment. I went inside the apartment, washed my hands in the bathtub and then went to bed . . . .

Following this statement, appellant was taken into custody. Special Agent Robinson recalled that the following day, he received a request from appellant to speak with him. He recorded a statement from appellant, but it was not reduced to writing. In the statement, appellant complained about her accommodations at the jail as well as voiced complaints about the LPD. She also stated that she did not regret her actions. She said that the LPD's investigation into her allegations against the victim was not moving fast enough and that "[t]hey didn't make him pay for it."

Special Agent Robinson said that in appellant's fifth and final statement on August 20, she divulged information about the remaining points of origin of the fire at the victim's residence. She also modified her August 17 statement and said that she was still partially clothed, wearing pants, when she went into the kitchen to retrieve a knife.

On cross-examination, Special Agent Robinson testified that he could not discern which point of origin was lit first, nor could he ascertain how long they burned or at what hour they were set. He could, however, opine as to the "stage" the fire had reached when it was extinguished, which was the "decay" phase. He agreed that in appellant's August 20 statement, she indicated that her husband had returned to the victim's residence and started the fire. At some point after that interview, Special Agent Robinson charged Jason McCullom with arson. He confirmed that the victim was deceased at the time the

---

[1]     At this point in the interview, appellant produced for Special Agent Robinson the lighter to which she referred in her statement.

fire was ignited because had he been breathing, soot would have "caked" inside of his nostrils.

Special Agent Robinson stated that during his search of the victim's residence, he found feminine undergarments in a dresser drawer. He acknowledged that during appellant's first interview, she admitted to having lived with appellant for a brief period of time and also to having lived in the larger house with thirteen other people. It was during this interview, Special Agent Robinson recalled, that appellant told him about her four-year-old son and three-year-old daughter. Appellant stated that her mother previously had lived in the larger house on the victim's property for a period of time, for which she had paid $600 per month in rent. Appellant maintained that her then-boyfriend and father of her two children, Michael Bonino, lived in the victim's actual residence with her.

Special Agent Robinson agreed that in the August 20 interview, appellant told him that the victim kept a pair of her undergarments under his pillow and that he had, on occasion, removed her used toilet paper from the bathroom and kept it. These behaviors precipitated an altercation between Mr. Bonino and the victim. In her August 14 interview, appellant acknowledged that she and the victim always had a close relationship but denied that it was ever sexual in nature. In that same interview, appellant claimed that the victim took her children to Burger King for ice cream one day, and when her brother picked them up and brought them home, her daughter said that the victim had "touched her monkey" and that her son had witnessed it. Appellant also mentioned that there were rumors about the victim's inappropriate behavior toward other children, including his own brother, and that "[n]o one had ever done anything about what he [did].

Special Agent Robinson clarified that August 18 was the first time he interviewed appellant after she had been arrested. During that interview, she told Special Agent Robinson that she had mental issues that precluded her from being in a room by herself and that because of her accommodations, she had not been able to eat or sleep. She asked to be sent to Centerstone, a treatment center for mental conditions and substance abuse issues, and requested to be placed back on her medicine. She discussed child custody arrangements and said that pursuant to her belief that her husband would soon be arrested, she wanted her mother to care for her children to prevent their being taken into State custody.

Special Agent Robinson acknowledged that in one of appellant's interviews, she referred to having been drinking and inebriated at the time of the incident. At some point, appellant advised that she was bipolar, suffered from post-traumatic stress disorder, had been treated in several different mental health facilities, and had been sexually abused as a child. Special Agent Robinson confirmed that it was during the August 20 interview that appellant first accused her husband of having set the fire. He recalled that

appellant told him that "she went home and that Jason had seen blood on her[ ] and that Jason went back and caught the house on fire." He also agreed that appellant told him that her husband was a member of a gang, the Vice Lords.

Special Agent Robinson opined that the victim's pants were likely askew because "somebody may have dressed him, tried to dress him after the fact to make it look accidental, an accidental fire." He confirmed that appellant told him that Mr. McCollum left their home with the intent of going to the victim's home and that when he returned, Mr. McCollum told appellant that he had started the fire. Special Agent Robinson recalled appellant's telling him, "'I'm not going to take the rap for all of this.'" Appellant denied having stabbed the victim in the back but acknowledged that she "believed" that she stabbed him in the armpit. In this statement, appellant claimed that Mr. Collum told her that he had started a fire in the victim's bedroom, in the kitchen, and on the living room sofa.

On redirect examination, Special Agent Robinson recalled that appellant had informed him that she had known the victim since she was fourteen or fifteen years old, at which time the victim began buying beer for her. According to appellant, the victim previously had made sexual comments toward her, which angered her then-boyfriend Michael Bonino. Special Agent Robinson confirmed that all of these allegations about the victim occurred prior to June 18, 2012, which was the day on which appellant reported the alleged abuse of her daughter by the victim to the police. He explained that while appellant implicated her husband in the August 20 interview, "she never backed off killing [the victim]. In fact, that statement, I believe she said that she didn't regret what she had done to [him]."

The State's next witness was LPD Detective James L. Johnson. Detective Johnson responded to the fire at the victim's residence around 6:00 a.m. on August 14 and met with Chief Williams while he waited for other detectives and Special Agent Robinson to arrive. After Special Agent Robinson arrived and the scene had been rendered safe to enter, Detective Johnson, Special Agent Robinson, and Assistant Director Whitsett entered the residence. Assistant Director Whitsett pronounced the victim deceased, and Detective Johnson assisted him in rolling the victim's body for further visual examination and in preparing the victim's body for transport. Detective Johnson returned to the scene the following day to assist Special Agent Robinson in collecting evidence and photographing the scene. At some point, pursuant to a court order, Detective Johnson collected a DNA sample from appellant and her husband, and those samples were stored in an evidence locker until they were delivered to Tennessee Bureau of Investigation ("TBI") by Detective Scott Braden. As part of his investigation, Detective Johnson determined that the victim had no prior criminal history. He also obtained a statement from Jason McCollum on August 23, 2012.

Detective Johnson testified that Mr. McCollum reported to the police department on his own volition, at which time Mr. McCollum gave the following statement after having been advised of his rights:

> Tuesday morning, . . . my wife, [appellant], came home. [Appellant] told me that she had killed [the victim]. I said, ["]What?["] She said, ["]I killed [the victim].["] [Appellant] said, ["]Please help me. I f****d up.["] I told her the only way I knew to cover up stab wounds was to set the house on fire, so it would look like an electrical fire. [Appellant] had on a white bra and blue jeans. I saw she had blood on her right shoulder and across her chest. I left her at our house[] and told her that she didn't need to be seen back over there.

> I walked from our house back to [the victim's] house. When I got there, I used my shirt to open the front door. I went inside and saw [the victim] lying across the bed on his back, not breathing. I took a lighter out of my pocket and lit the sheets he was lying on . . . top of. I lit a wire in the closets, then lit the jackets and shirts in the closets, one by one. Then I went into the kitchen, went in the kitchen, and lit a large white dishrag that was lying on top of the stove. Then I came out of the kitchen, the bed wasn't burning good, so I took some clothes off the top of the dresser and threw them on top of him. Once I done this, the bed started burning more. I left the bedroom and went into the living room. When I got into the living room, I lit the front end of the couch on fire.

> After I set the fires, I left and walked back home. The next day, I took the clothes that [appellant] was wearing and burned them on a grill outside the duplex we live in.

Detective Johnson stated that he did not follow up on Mr. McCollum's statement regarding his burning the clothing that appellant had been wearing on the night in question. Detective Johnson confirmed that everything Mr. McCollum told him about the fire was included in the statement.

Marshall County Sheriff's Department Chief Deputy Bob Johnson was the State's next witness. Chief Deputy Johnson testified that aside from being summoned to the scene of the fire and murder, his part in the investigation involved searching the woods adjacent to appellant's residence in an attempt to locate the knife that she described as the murder weapon. During his August 17 search, Chief Deputy Johnson located a knife blade and a handle that had been separated from the blade. They were located within the same general area and approximately ten feet apart. He described the blade as being serrated. He turned over both items to Special Agent Robinson.

The State called LPD Officer Shawn Crawford as its next witness. Prior to joining law enforcement, Officer Crawford had been a firefighter in Bedford County for eleven years. At the time of the incident, he was employed as a patrol officer. Officer Crawford was dispatched to the scene and was the first officer to arrive. When he looked through the victim's window, he observed heavy black smoke inside the residence, and the door was hot to the touch. He did not enter at that time because he was concerned with "flashover." He never actually entered the residence but stood at the doorway while a firefighter entered and attempted to locate the victim. Officer Crawford and Officer Clint Newbill secured the area with crime scene tape.

Prior to the incident in question, on June 18, 2012, Officer Crawford recalled that he was dispatched to appellant's residence for a call involving "possible indecent exposure." When he responded, appellant informed him that she believed that her daughter had been the victim of inappropriate touching by the victim. She reported that the victim had telephoned her and asked if he could take her children out for ice cream. She assented because the victim had frequently come by with snacks and candy for the children. After approximately an hour had passed, appellant attempted unsuccessfully to reach the victim by calling his residence. At that time, she requested that her brother proceed to the victim's residence and retrieve her children. After a short while, he returned to appellant's home with the children. After appellant relayed this information, Officer Crawford transported appellant, Mr. McCollum, and the children to the emergency room of Marshall Medical Center, where the detectives met them. He subsequently drove appellant and her family back to their home. At some point he heard appellant exclaim, "They ain't going to do anything about this." He also retrieved the clothing that appellant's daughter had been wearing and subsequently turned them over to Detective Braden. A referral to the Department of Children's Services ("DCS") was made.

On cross-examination, Officer Crawford confirmed that appellant had reported that when the children arrived home, she attempted to bathe her daughter, but when she tried to wash her daughter's "private parts," the child began fighting with appellant. The daughter then told appellant that "Pap," which was her name for the victim, had "touched her monkey." Officer Crawford did not recall at what point he deemed it necessary to inform the officers investigating the victim's murder about the statements that appellant had made in this regard. He also clarified that in response to appellant's concern that no one was going to take action about what had allegedly happened, he told her to "let [law enforcement] take care of it."

LPD Detective Santiago McKlean was the State's next witness. On June 20, 2012, Detective McKlean was assigned to investigate the alleged touching of appellant's daughter. Detective McKlean contacted a DCS caseworker, Debra Transue, and together

they visited appellant, her brother Eric Darling, and Jason McCollum at appellant's residence. Ms. Transue spoke with both children; the boy was four years old, and the girl, the alleged victim, was three years old. Detective McKlean recalled that the boy did not make a disclosure and that the girl alleged that "Pap had touched her monkey," referring to her genital area. At that time, Detective McKlean and Ms. Transue decided to arrange a forensic interview. The interview was scheduled for June 27 at Junior's House Child Advocacy Center in Lewisburg. Detective McKlean was unable to attend, but he visited appellant's residence that same evening and advised her that the next step was to review the facts assessed during the interview.

Detective McKlean recalled that he participated in a meeting of the Child Protective Investigative Team ("CPIT") on July 13, 2012. He described CPIT as "association of members of the DCS, law enforcement, and . . . Assistant District Attorney[,] . . . and we all [get] together to talk about cases of this matter." In such a meeting, the team would decide collaboratively whether a perpetrator would be indicted. Based on the decision, the team would either close the case at that time or proceed with the investigation. In the July 13 meeting, Ms. Transue presented the case and stated that matter was unclear because the alleged child victim "could not actually articulate" what had happened to her. Accordingly, a second interview was scheduled. At that time, Detective McKlean learned that both children were residing in Pennsylvania. He had not been informed of their relocation prior to that time.

Detective McKlean later learned that a forensic interview had been scheduled for the child through Pennsylvania's counterpart to DCS on July 26. Detective McKlean did not receive the recording of the July 26 interview until September 19, 2012. During this time, Detective McKlean did not arrest the victim because he "did not have basis or facts or proof that he had done such a thing." Also, during this time, Detective McKlean was in frequent contact with appellant; she called the police department often for updates. Detective McKlean stated that he explained to her that he needed to wait for the recordings of the interviews, but appellant did not agree with his approach.

Detective McKlean testified that he was on duty on June 28 when he heard a dispatch over his radio that the victim's vehicle had been vandalized. Based on the content of the radio dispatch, Detective McKlean drove to appellant's residence and advised her that she needed to stay away from the victim. He described appellant as "upset. She was angry." Appellant responded, "'I will take care of it in my own way.'" At this point, according to Detective McKlean, he had spoken with appellant five times, which was almost every day since the initial accusation was made.

Detective McKlean confirmed that he received a video of the second forensic interview from Pennsylvania's DCS but that he had not received any written reports from them. He clarified that he was not made aware that the second forensic interview had

been completed until he received the discs on September 19, 2012. Detective McKlean stated that in addition to the multiple times he had spoken with appellant, she had called approximately five additional times when he either did not answer or return her call. He also received several telephone calls from other members of appellant's family questioning why the victim had not been arrested. Detective McKlean explained that he did not press Junior's House for the results of the forensic interview because, as the children had relocated, they were no longer in danger.

Dr. Thomas Mitchell, a licensed physician practicing in the area of emergency medicine at the Marshall Medical Center, was the State's next witness. Dr. Mitchell was tendered by the State and accepted by the trial court as an expert witness. Dr. Mitchell testified that he examined appellant's daughter in the emergency room when she presented with complaints of inappropriate touching by the victim. He recalled that appellant reported that the child's genital area appeared "puffy and red" and that she relayed the circumstances of the alleged assault. After a physical examination, Dr. Mitchell performed a pelvic examination of the child. Because no allegation of penetration had been made, his examination was limited to the exterior of the child's genital area. Dr. Mitchell's examination revealed "[n]o obvious injury, no erythema, which means redness." He saw "no evidence of redness or swelling." Moreover, Dr. Mitchell concluded that the child's mood was "normal" for a three-year-old child. The child was discharged with instructions for appellant to seek follow-up care with Our Kids in Nashville and to keep the child away from the alleged perpetrator, the victim in this case.

The State called Debra Transue, an investigator with the Office of Child Safety, a division of DCS, as its next witness. Ms. Transue confirmed that on June 19, she received a report alleging that appellant's daughter had been inappropriately touched by the victim. She made initial contact with the child and appellant's family on June 20. During this meeting, the child disclosed that "Pap" had allegedly "touched her monkey." Appellant also disclosed that she had been sexually abused as a child and that her mother did not believe her allegations.

Ms. Transue stated that she witnessed the interview via closed circuit as it was being conducted and that she listened to the interview again later. She asserted that she was not prepared to take the case to court based on the content of the interview. She described, "What [the child] said was not clear enough to state that she had been sexually molested by anybody." In addition, the child made contradictory statements about the circumstances and details of the alleged abuse. Ms. Transue advised appellant of the need for a second "extended" forensic interview in which the child would meet with the interviewer on an ongoing basis to establish rapport and facilitate further discussions and/or possible disclosures. In the interim, appellant's mother, Gidget Darnell, traveled to Tennessee from Pennsylvania and took the children home with her.

Ms. Transue recalled that after receiving the DVD recording of the forensic interview that took place in Pennsylvania, DCS determined that "there was enough preponderance of the evidence for [them] to say that there was sex abuse" against the child. She clarified that they did not have the benefit of that interview during the CPIT meeting. She confirmed having a conversation with Detective McKlean on July 6 wherein he indicated his intent to interview the victim in this case about the sexual abuse allegations against him the following week. To her knowledge, that interview was never completed. However, as a member of the CPIT team, Ms. Transue did not believe that at the time in question there was enough information to formally charge the victim.

Connie Crick, the victim's daughter, was the State's next witness. Ms. Crick recalled that the victim owned two rental properties—the larger house on the property on Franklin Street and the smaller house that was adjacent to the victim's residence. Ms. Crick recalled that after she moved out of the victim's house and had children of her own, the victim would assist her by picking up her children from daycare if they fell ill and by keeping them on weekends when she had to work. Her children also spent a great deal of time with him during the summer when school was not in session. She never had any problems with the victim's spending time alone with her children.

Ms. Crick stated that initially, the victim did not rent any of his property. He resided in the larger house and then built a shop, which was where he eventually lived. He later built a structure next to it. When the victim began to rent his property, Ms. Crick's relationship with him became "strained." She said that some of his renters were not "good people" to have around her children. Also, at that time, appellant lived with the victim. Ms. Crick ceased her habit of purchasing groceries for the victim, which she had done when he was "down on his luck," because the victim would cook for the "several people," including appellant, who lived on his property. She refused to provide food for the victim to prepare for other people.

When appellant began "hanging around" with the victim, Ms. Crick ended her relationship with the victim. She recalled that the victim would occasionally move between the larger house and the smaller structure in which he ultimately lived. Appellant once lived in the larger house with her family. After her family had vacated, the victim moved back into the larger house. Appellant then moved in with the victim after the birth of her first child.

Special Agent David Houston Hoover with the TBI was the State's next witness. He was tendered by the State and accepted by the trial court as an expert in the field of latent fingerprint interpretation and/or investigation. He examined several pieces of evidence from the crime scene but found no identifiable latent fingerprints on any of the items.

TBI Special Agent/Forensic Scientist Mark Dunlap was accepted by the trial court as an expert in forensic biology with an emphasis in serology and DNA analysis. Special Agent Dunlap received buccal swabs from the victim, appellant, and Mr. McCollum and obtained a complete DNA profile of each person. He examined several items taken from the crime scene that failed to render either the presence of blood or a comparable DNA sample. However, he obtained DNA from a cigarette butt taken from the victim's residence that identified appellant as the major contributor and insufficient DNA to determine the minor contributor. Statistically, the odds of another person with the same DNA profile as found on the cigarette butt was one in a number greater than seven billion. Special Agent Dunlap examined the shirt the victim was wearing at the time he was killed. The victim was the major, if not only, contributor on all of the examination points. However, a minor contributor was located on a bloodstain on the victim's collar; the DNA was either insufficient or too degraded to exclude appellant. Special Agent Dunlap explained that DNA can be transferred by "touch," so the contribution on the victim's collar could have been placed there by means other than blood. Special Agent Dunlap analyzed a broken knife blade and found the victim's DNA on it. He examined several points on the victim's bedding and found that in "area number three," the partial DNA profile matched the victim, but the minor contributor could not be confirmed because of the insufficiency or degradation of the sample. However, Mr. McCollum could be excluded.

Special Agent Dunlap stated that he analyzed both the knife blade and the handle that were obtained from the wooded area around appellant's residence but that DNA interpretation on both items was inconclusive.

Sherry King, the victim's niece, was the State's next witness. Ms. King testified that she was acquainted with appellant from having seen her at the victim's residence when he lived in the larger house on his property. She recalled that at one point, appellant, her then-boyfriend Michael Bonino, and the victim all lived together in that residence. Later, Ms. King became familiar with appellant's children when the victim would take them to a dance to which Ms. King took her mother and grandmother on weekends. She said that the victim brought them there to "show them off." When the victim lived in the garage structure, Ms. King saw appellant's children there on more than one occasion. During all of these times, the victim was alone with the children, and appellant was not present. She observed the victim interact with the children and stated that he was "very good" with them and that he "loved" the children.

TBI Special Agent/Forensic Scientist Meredith Riley Lewis testified for the State and was accepted by the trial court as an expert in the field of microanalysis of fire debris for the identification of ignitable liquids. She tested charred clothing remains that belonged to the victim, the bedding from his residence, debris from the closet floor, a

liquid sample from the bedroom floor, and the victim's pants and underpants. Special Agent Lewis did not detect the presence of an ignitable liquid on any of those items. However, she clarified that simply because her testing did not detect such, it did not eliminate the possibility that an ignitable liquid was used. A lack of detection could be attributed to evaporation, heat degradation, or water damage.

Special Agent Lewis analyzed charred debris from a bedroom cabinet and detected the presence of "medium to heavy petroleum distillate." She explained that "[p]roducts in this range include, but are not limited to, mineral spirits, dry cleaning solvents, kerosene, diesel fuel, fuel oils, number one and two jet A, which is aviation fuel, some charcoal starters, some torch fuels, some paint thinners, some solvents from insecticides and polishes and also some lamp oils." Special Agent Lewis tested a liquid sample from the container taken from the front of the victim's residence and found the presence of an evaporated gasoline-range product, which would include all brands and grades of automotive fuel, including gasohol. Her analysis of the liquid sample taken from the container found in the kitchen revealed the "presence of a product [that] could not positively be identified or classified, due to the deterioration condition of the sample." Also, testing of one of the victim's socks rendered the same result.

TBI Special Agent/Forensic Scientist Miranda Gaddes was accepted by the trial court as an expert in the area of microanalysis with specialization in paint analysis, fiber analysis, shoe and tire track comparison, and physical comparisons. Special Agent Gaddes examined five charred pieces of woven fabric that were taken from a grill, but the fabric was too damaged for fiber-type determination. Upon her visual inspection she concluded that the fabric was from an article of clothing rather than a cloth.

Special Agent Gaddes also analyzed several knives and knife pieces that were recovered from the victim's home, as well as a broken knife blade and handle that were recovered from the wooded area around appellant's residence. She concluded that the broken knife blade from the debris "fracture matched" the knife blade that was found around the perimeter of appellant's residence. Comparing the knife blades with the handle that was recovered, Special Agent Gaddes concluded that the two pieces of the broken knife blade and the knife handle "had been joined at one time."

The State's final witness was Dr. Thomas Deering, a forensic pathologist who performed the autopsy of the victim. He was tendered and accepted as an expert in his field. Dr. Deering opined that the cause of the victim's death was multiple knife stab wounds and that the manner of death was homicide. He stated that the victim was burned after he was deceased. Dr. Deering observed fourteen stab wounds on the victim's body, two of which were "through and through," thus resulting in twelve entrance wounds. The victim's stab wounds were as follows: torso area, which struck and fractured a rib; torso area, which struck and fractured the sternum, pierced the pericardium, and stabbed the

left ventricle of the heart; torso area, under the right arm pit, which went between ribs six and seven and punctured the right lung; torso area, under the right arm pit, which went between ribs seven and eight punctured the liver; four stab wounds to the central area of the back, none of which caused internal injuries; two "through and through" stab wounds to the left forearm resulting in four stab wounds, which were "consistent with the notion of defensive wound[s]"; upper left arm, which was not a life-threatening injury; and left hip area, which caused no internal injury. Dr. Deering concluded that the stab wound to the left ventricle "certainly" could have been the fatal stab wound and that it would have been "very difficult to revive [the victim] before [he] died just because it's bleeding so rapidly." He opined that both stab wounds under the victim's arm pit would have bled "significantly" and that either of them could have been "potentially fatal."

Dr. Deering reviewed the victim's toxicology report and opined that the victim did not inhale any smoke. He also did not detect any soot in the victim's lungs. Moreover, the toxicology report indicated "no reportable level of ethanol" in the victim's body.

Upon this evidence, the State rested its case-in-chief. Appellant presented as her first witness Eric Darling, her brother. Mr. Darling stated that he had been acquainted with the victim because he, his mother, and his step-father had rented property from the victim. They had rented the larger house on the victim's property for around six months before moving into the smaller structure adjacent to the victim's apartment. When they resided in the smaller residence, appellant and her then-boyfriend lived with them as well. He recalled that appellant also resided on the property at additional times.

Mr. Darling testified that he had been around the victim when he was with appellant's children approximately a dozen times. He recalled that the children referred to the victim as "Pap." He recited the events of June 18 consistently with prior testimony. He added that after he returned the children to appellant, he walked next door to the duplex he occupied and began to watch television. Approximately thirty minutes later, appellant knocked on his door and described her bathing of her daughter and the ensuing disclosure. He returned with appellant to her duplex. Mr. Darling spoke with the child, and she told him that "Pap had touched her monkey."

On cross-examination, Mr. Darling acknowledged that the police arrived "pretty quickly" after appellant called them. He said that when he picked up the children from the victim's residence, they did not appear happy to see him but rather seemed "weirded out" and "not themselves." He said that he immediately advised appellant of their demeanor when he delivered them to her residence. However, Mr. Darling failed to report this in his statement.

The State reviewed Mr. Darling's statement to law enforcement with him and noted that Mr. Darling had said that after he knocked on the victim's door, he did not

receive an answer but instead waited around two minutes before anyone answered.  He saw "[t]he victim and kids coming from the back of the home, as if he was [sic] trying to ignore [his] presence."  Mr. Darling clarified that he made that statement because when the victim walked through the door and saw Mr. Darling, "he turned around and went back to the back room."  Mr. Darling wrote in his statement that when he returned with appellant to her residence, he questioned the older child, appellant's son, who also said that the victim had inappropriately touched the child.

Appellant re-called Special Agent Robinson as a witness.  Special Agent Robinson repeated in large part his testimony regarding the four points of origin of fire, the rag that was found on top of the stove, and the source of the fire.  Special Agent Robinson acknowledged that Mr. McCollum's statement was consistent with each of the four points of origin of fire.

On cross-examination, the State asked if Mr. McCollum had stated that he lit a wire in the closet, and Special Agent Robinson agreed that he had.  Special Agent Robinson further agreed that he did not find a wire in the closet, thus rendering Mr. McCollum's statement inconsistent with the evidence.  Special Agent Robinson confirmed that over the course of all of appellant's statements, she accounted for all four points of origin.  He opined that appellant's and Mr. McCollum's statements were "equal" because both of them had at least one inconsistency with the evidence.

The jury deliberated and found appellant guilty as charged of first degree premeditated murder and arson.  The trial court sentenced appellant to life in prison without the possibility of parole for her murder conviction and a consecutive sentence of five years for the arson conviction.

## II.  Analysis

Appealing her convictions and sentences, appellant sets forth the following in her Statement of the Issues Presented for Review:  (1) whether the evidence was sufficient to support her convictions; (2) whether her arson conviction should be set aside based upon the "physical facts" rule; (3) and whether the trial court erred in aligning her sentences consecutively.

### A.  Sufficiency of the Evidence

#### 1.  Standard of Review

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

2. First Degree Premeditated Murder

Appellant stands convicted of first degree premeditated murder, which is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is further defined as "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). "'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* Moreover, the accused's mental state "at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

-23-

Appellant asserts that "the evidence supports a manslaughter conviction but not a first degree [murder] conviction." Respectfully, we disagree. In her statement, appellant confesses to stabbing the victim multiple times. The element of "intentional killing" is met by this evidence. Our inquiry is thereby limited to whether the evidence presented at trial was sufficient for the jury to conclude that appellant killed the victim with premeditation.

"The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005) (citing *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003)). A jury "may infer premeditation from the manner and circumstances of the killing." *Id.* (citing *Bland*, 958 S.W.2d at 660). Among the circumstances that may support a finding of pre-meditation are:

> "[D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing."

*Id.* at 409 (quoting *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000)). In addition, a jury may infer premeditation from the "'[e]stablishment of a motive for the killing.'" *Id.* (citing *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004)).

In the light most favorable to the prosecution, the State presented evidence that appellant's daughter had made allegations that the victim had touched her inappropriately. From this, the jury could have inferred a motive for appellant's killing the victim. Moreover, appellant expressed her discontent with law enforcement's investigation of these allegations by stating that the police "ain't [sic] going to do nothing about this," and "I will take care of this myself." Both of these statements can be reasonably construed as declarations of intent to kill the victim. Appellant followed the victim into his bedroom under the pretext of engaging in sexual intercourse then procured a knife from his kitchen. She proceeded to stab the unarmed victim, who had already removed his prosthetic leg, multiple times. She attempted to conceal the fact of the murder by setting fire to the bed upon which she stabbed the victim. Appellant maintained her composure well enough to remember to remove the murder weapon, take it to her residence, and attempt to set fire to it in a bucket in her yard then dispose of the evidence in the woods. These facts, we conclude, are sufficient to support appellant's conviction for first degree premeditated murder.

## 3. Arson

Appellant argues that "the arson conviction is not supported by the evidence [because] [t]he evidence at trial showed that Mr. McCollum was the one who started the fire."

As indicted in this case, the offense of arson is defined as "knowingly damag[ing] any structure by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein."  Tenn. Code Ann. § 39-14-301(a).

The evidence presented at trial established four separate points of origin of fire.  In her third statement, appellant claimed responsibility for two points of origin, the victim's bed and his closet, which the evidence supported.  She also claimed having attempted to set a fire in the kitchen by igniting wires attached to the stove, but the evidence did not support this statement.  Mr. McCollum, appellant's husband, claimed responsibility for adding additional material to the fire on appellant's bed, for setting fire to a rag that was on the stove in the kitchen, for starting a fire in the closet by lighting a "wire" and by lighting several articles of hanging clothing one-by-one, and by setting fire to a sofa in the living room.  While acknowledging that Mr. McCollum's statement encompassed all four points of origin of fire, Special Agent Robinson stated that appellant's and Mr. McCollum's statements were "equal" because both of them had at least one inconsistency with the evidence.

In the light most favorable to the prosecution, we conclude that the evidence was sufficient to convict appellant of arson.  Her statement clearly accounted for all of the points of origin of fire.  The fact that Mr. McCollum may have exacerbated the fire(s) and started new ones does not negate appellant's culpability.

We further note that the trial court instructed the jury on the theory of criminal responsibility:

> A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . .

Tenn. Code Ann. § 39-11-402(2).  The jury arguably could have concluded that appellant solicited assistance from Mr. McCollum in concealing her crimes.  She is without relief on this claim.

## B. The "Physical Facts" Rule

In her Statement of the Issues Presented for Review, appellant states that "her arson conviction should be set aside based upon the 'physical facts' rule." The "physical facts" rule, made applicable to criminal proceedings by *State v. Hornsby*, 858 S.W.2d 892, 893 (Tenn. 1993),

> is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it.

*State v. Allen*, 259 S.W.3d 671, 679 (Tenn. 2008).

However, in this case, the only mention of this rule in appellant's brief is in her Statement of Issues; she does not address it in the argument section of her brief whatsoever. There is no citation in her brief concerning this rule, and she does not seek to argue the rule's application to her case. "Appellate briefs shall contain the contentions of the appellant with respect to the issues presented, . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review." Tenn. R. App. P. 27(a)(7) (emphasis added). In light of her failure to properly present this issue for our review, we conclude that she has waived appellate review of this claim of error. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011).

## C. Sentence Alignment

Appellant was sentenced to life in prison without the possibility of parole for her murder conviction and to a consecutive sentence of five years for arson. She now argues that the trial court erred in aligning her sentences consecutively. However, appellant has failed to include a transcript of the sentencing hearing in the appellate record, which prevents us from reviewing the trial court's considerations and conclusions. Appellant bears the burden of presenting an adequate record on appeal. Tenn. R. App. P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." *Id.* at 560-61 (citing *State v. Roberts,* 755 S.W.2d

833, 836 (Tenn. Crim. App. 1988)). "However, our supreme court has cautioned, in sentencing cases, that if 'the record is adequate for a meaningful review, the appellate court may review the merits of the sentencing decision with a presumption that the missing [evidence] would support the ruling of the trial court.'" *State v. Jarus Smith*, No. M2014-01130-CCA-R3-CD, 2015 WL 4656553, at *17 (Tenn. Crim. App. Aug. 6, 2015), *perm. app. denied* (Tenn. Dec.10, 2015) (quoting *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012)).

In this case, appellant failed to include a copy of the sentencing hearing transcript or presentence report. In her brief, appellant states, and seemingly adopts as correct, that the trial court aligned her sentences consecutively in part because she was on probation when she was committed these offenses. While Tennessee Code Annotated section 40-35-115(b)(6) permits a trial court to align sentences consecutively if a "defendant is sentenced for an offense committed while on probation," a brief in appellant's statement is not evidence. *State v. Bennett*, 798 S.W.2d 783, 789 (Tenn. Crim. App. 1990). Accordingly, this dearth of information precludes "meaningful appellate review" of this issue and properly results in waiver.

## CONCLUSION

Based upon our review of the record, the briefs of the parties, and the applicable legal authority, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, SPECIAL JUDGE